FILED
2024 Apr-12 AM 10:15
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## WESTERN DIVISION

| | |
|---|---|
| Christopher Barwick, <br>     *Plaintiff*, <br><br> v. <br><br> Regions Bank and Equifax <br> Information Services, LLC, <br>     *Defendants*. | ) <br> ) <br> ) <br> )        7:22-cv-01481-LSC <br> ) <br> ) <br> ) <br> ) |

### Memorandum of Opinion

Plaintiff Christopher Barwick ("Barwick") brings this action against Defendants Regions Bank ("Regions") and Equifax Information Services, LLC ("Equifax"). Barwick alleges that Regions negligently and willfully violated the Fair Credit Reporting Act ("FCRA") by failing to conduct reasonable reinvestigations into his disputed credit information. He alleges that Equifax negligently and willfully violated the FCRA by failing to follow reasonable procedures in preparing his consumer report and by failing to conduct a reasonable reinvestigation into his disputed credit information.

On September 22, 2023, Regions and Equifax filed Motions for Summary Judgment. (Doc. 31; Doc. 32.) The Motions have been fully briefed and are ripe for review. For the reasons explained below, Regions's Motion is DENIED. Equifax's Motion is GRANTED in part and DENIED in part.

1

## I.      Factual Background[1]

Equifax is a credit reporting agency ("CRA") that gathers credit information about consumers, which is then used to create credit files and subsequently credit reports. (Doc. 35 ¶¶ 4–6.) "Equifax accepts credit information only from those sources of information that it has determined are reasonably reliable based upon Equifax's own investigation, the source's reputation in the community, and Equifax's longstanding business relationships with that source." (*Id.* ¶ 9.) Equifax requires its sources of credit information, called "furnishers," to sign a comprehensive data furnisher agreement, in which the furnisher agrees to follow all applicable laws and to promptly notify Equifax upon discovering that any furnished information is incorrect. (*Id.* ¶ 10.) Further, Equifax "regularly conducts computerized quality checks before adding information from a data furnisher to its consumer database." (*Id.* ¶ 11.) Equifax considers Regions to be a reliable furnisher based upon Equifax's own investigation, Regions's reputation, and the pair's longstanding business relationship. (*Id.* ¶ 42.)

This case arises from Equifax's alleged inaccurate reporting of a mortgage loan that Barwick had with Regions. Barwick fully paid and closed the loan on

---

[1] The Court gleans these "facts" from the parties' submissions of "undisputed facts" and the Court's examination of the record. These are "facts" for summary judgment purposes only. Their inclusion in this Memorandum of Opinion does not signal their veracity. *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).

August 1, 2017. (Doc. 31 ¶¶ 1, 3; Doc. 37-1 ¶¶ 5, 8.) Regions proceeded to report the mortgage as closed and paid in full. (Doc. 31 ¶ 4.) Despite the mortgage loan being fully paid and closed, Equifax's credit file on Plaintiff indicated late payments for certain months in 2020 and 2021. (Doc. 39 at 14 ¶ 37; Doc. 40 ¶ 37; Doc. 34-1 ¶ 58; Doc. 34-1 at 249.) It is not entirely clear how the inaccuracies occurred. Equifax claims that starting in December 2021, Regions reported Barwick making late payments on the mortgage in August 2020, November 2020, December 2020, January 2021, February 2021, March 2021, June 2021, July 2021, August 2021, and September 2021 (the "Late Payments"). (Doc. 34-1 ¶ 58.) Equifax claims it then incorporated Regions's report into Barwick's credit file. (Doc. 39 at 13 ¶ 29; Doc. 40 ¶ 29; Doc. 34-1 at 249; Doc. 35-92 at 121:24–122:2.) In contrast, "Regions' records do not show any information reported to the credit bureaus—at any time, including this three month period—stating or instructing the credit bureaus to report that a delinquency or past due payment existed on the Loan in either 2020 or 2021." (Doc. 31 ¶ 31.) Regions seems to believe that the inaccuracies occurred because Equifax misinterpreted Regions's responses to unrelated disputes. (*Id.* at 29.)

In June 2022, Barwick directly contacted Regions to dispute the Late Payments. (Doc. 33 ¶ 42; Doc. 38 at 1–2.) However, on July 8, 2022, Regions denied Barwick's dispute in a letter, writing "[a] review of the credit reporting reflects several delinquent payments." (Doc. 34-3 at 2.)

Barwick also mailed a letter to Equifax disputing the Late Payments on July 2, 2022. (Doc. 34-1 at 140; Doc. 33 ¶ 44.) The letter stated, in pertinent part,

> "I am writing to dispute the information that Equifax is reporting with respect to a mortgage account that I previously had with Regions Bank . . . Equifax is reporting that I was late on paying this mortgage account . . . Each of these entries is incorrect. This mortgage was paid in full and satisfied in 2017."

(Doc. 34-1 at 140.) In the letter, Barwick provided his name, social security number, date of birth, and mailing address. (*Id.*) Equifax received the letter on July 11, 2022. (*Id.* ¶ 56.) According to Equifax, because Barwick's dispute letter did not include "qualifying documentation,"[2] Equifax could not unilaterally remove the Late Payment information from Barwick's credit file. (*Id.* ¶¶ 61, 64.) Instead, Equifax sent an Automated Consumer Dispute Verification ("ACDV") to Regions on July 13, 2022, attaching Barwick's July 2, 2022 letter. (*Id.* ¶¶ 65–66.) In the ACDV, Equifax detailed the Last Payment Date on the mortgage as August 1, 2017 and the Date Closed for the mortgage as August 1, 2017. (*Id.* at 176.) Equifax described Barwick's dispute as "disputes present/previous account status/payment rating/account history. Verify account status, payment ratio, and account history." (*Id.*)

---

[2] "Qualifying documentation" consists of a data furnisher letter that "(1) includes the consumer's name and address (2) is printed on furnisher letterhead, (3) lists the disputed account, the name of the data furnisher, and the full or partial account number, and (4) contains clear instructions on how the account should be reported or updated on the file." (Doc. 33 ¶ 17.)

Upon receipt of the ACDV, Regions employed its internal processes for verification. (Doc. 35-1 ¶¶ 29–30.) These processes include requiring dispute specialists—who Regions trains on internal policies, relevant law, record keeping systems and other software (*Id.* ¶ 2)—to thoroughly review all information related to the dispute, such as ████████████████████████████████ ███████████████████████. (Doc. 37-1 ¶ 17; Doc. 37-9 at 86:3–6.) In practice, dispute specialists review the ACDV and attachments received from the credit bureau and review the documents within Regions's system that pertain to the disputed information by referring to an internal guide, called an ACDV checklist. (Doc. 35-1 ¶¶ 18–19.) Beyond this, Regions consistently reviews the work of dispute specialists for quality control purposes. (*Id.* ¶ 22.)

Regions's dispute specialist investigated Barwick's dispute, filling out the ACDV checklist. (*Id.* ¶ 28; Doc. 35-6; Doc. 35-7.) "According to that Checklist, [the dispute specialist] reviewed (i) all images attached to the ACDV, (ii) the account status as of the date last reported, (iii) the payment history and delinquencies, and (iv) any additional relevant information in Regions' file." (Doc. 31 ¶ 27; Doc. 35-65.) Upon completing this investigation, Regions responded to the ACDV on August 4, 2022, indicating that the loan was paid in full and verifying the Late Payment information as accurate. (Doc. 34-1 ¶ 68; Doc. 35-1 ¶ 31–32; Doc. 29 ¶¶ 7–8.)

In accordance with its standard procedures, Equifax "reviewed and considered all relevant information, including the ACDV response." (Doc. 33 ¶ 50; Doc. 34-1 ¶¶ 69–70.) Equifax then mailed a letter to Barwick explaining the disputed information was "verified" as correct and accurate. (Doc. 34-1 ¶ 70.)

On August 29, 2022, Barwick sent another letter to Equifax disputing the late mortgage payment information. (Doc. 34-1 at 181–84.) In addition to the previously provided personal information, Barwick attached to this second dispute a letter from Regions to Barwick, dated September 2, 2017, confirming "that funds have been received for payment in full" on the disputed mortgage loan. (*Id.* at 184.)

Upon receipt of the August 2022 dispute, Equifax followed its standard reinvestigation procedure to determine whether there was sufficient information in the letter for Equifax to unilaterally remove the Late Payments. (*Id.* ¶¶ 74–76.) Because the mailing address on the attached September 2017 letter from Regions did not match any of Equifax's recorded addresses for Barwick and because the Regions letter "did not contain clear instruction as to how the account should be reported or updated on the consumer's file," Equifax determined it could not unilaterally update Barwick's file. (*Id.* ¶¶ 75–76.) Equifax proceeded to send an ACDV to Regions on September 7, 2022, attaching Barwick's August 2022 dispute letter and the September 2017 letter from Regions. (*Id.* ¶¶ 78–79.)

A Regions dispute specialist then investigated the second dispute and filled out an ACDV checklist. (Doc. 31 ¶ 31.) "According to that Checklist, Estella reviewed (i) all images attached to the ACDV, (ii) the account status as of the date last reported, (iii) the payment history and delinquencies, and (iv) any additional relevant information in Regions' file." (Doc. 31 ¶ 32; Doc. 35-70.)[3] On September 8, 2022, Regions responded to the ACDV, confirming that the Loan was paid in full and that Barwick's account information was "accurate." (Doc. 34-1 ¶ 8; Doc. 35-1 ¶¶ 37–38; Doc. 29 ¶¶ 15–16.) Regions indicated the disputed Late Payments should continue to be reported. (Doc. 34-1 ¶¶ 81–82.)

After receiving Regions's response to the ACDV, Equifax "completed the remainder of its reinvestigation, reviewed and considered all relevant information, including the ACDV response, and applied its policies and procedures." (Doc. 34-1 ¶ 81.) On the same day Equifax received the response from Regions, September 8, 2022, Equifax mailed a letter to Barwick describing his credit account as "researched" and "verified" as correct. (*Id.* ¶ 83.)

Barwick proceeded to file this lawsuit, which was removed to this Court on November 22, 2022. (Doc. 1.) While he does not claim damage to his credit (Doc. 38 at 22; Doc. 39 at 24), he claims that his anxiety and/or depression "dramatically

---

[3] The dispute specialist that investigated this particular dispute testified that she did not remember investigating this particular dispute but that she had investigated hundreds of other disputes in accordance with these procedures. (Doc. 37-10 at 13:23–14:4, 34:10–35:22.)

increased" after receiving the first letter from Equifax (Doc. 34-2 at 294:12–15) and that he has experienced neck pain and headaches (*Id.* at 297:12–13.) Equifax removed the Late Payment information from Barwick's credit file on July 5, 2023. (Doc. 34-1 ¶ 85.)

## II.   Standard of Review

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court "must view all evidence most favorably toward the nonmoving party, and all justifiable inferences are to be drawn in the nonmoving party's favor." *Hoffman v. Allied Corp.*, 912 F.2d 1379, 1383 (11th Cir. 1990). The Court does not weigh the evidence as fact-finder; rather, it must "determin[e] whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby*, 477 U.S. 242, 250 (1986).

## III.   Analysis

### A. Regions's Liability

Barwick alleges that Regions violated § 1681s-2(b) of the FCRA by conducting an unreasonable investigation of Barwick's dispute. Barwick further alleges that Regions's investigation went beyond mere unreasonableness,

constituting reckless and willful behavior in violation of § 1681n(a). For the reasons provided below, the Court finds that there is a genuine issue as to the whether Regions's investigation was reasonable. The Court further finds there is a genuine dispute as to whether Region's investigation was reckless and willful.

"The FCRA requires CRAs and entities that furnish information to CRAs ('furnishers' or 'furnishers of information') to investigate disputed information. When a consumer disputes information with a CRA, the CRA must 'conduct a reasonable reinvestigation to determine whether the disputed information is inaccurate.' As part of this investigation, the CRA is required to notify the person or entity that furnished the information that the information has been disputed." *Hinkle v. Midland Credit Mgmt., Inc.*, 827 F.3d 1295, 1301 (11th Cir. 2016) (internal citations omitted) (quoting 15 U.S.C. § 1681i(a)(1)(A)).

"Upon receipt of this notice, the furnisher of information must: (1) 'conduct an investigation with respect to the disputed information'; (2) 'review all relevant information provided by the consumer reporting agency' in connection with the dispute; and (3) 'report the results of the investigation to the credit reporting agency.'" *Marchisio v. Carrington Mortg. Servs., LLC*, 919 F.3d 1288, 1301 (11th Cir. 2019) (quoting 15 U.S.C. § 1681s-2(b)(1)(A)–(C)).

Reasonableness is "the 'appropriate touchstone' for evaluating a furnisher's investigation under § 1681s-2(b)." *Marchisio*, 919 F.3d at 1302 (quoting *Felts v.*

*Wells Fargo Bank, N.A.*, 893 F.3d 1305, 1312 (11th Cir. 2018)). "[W]hat constitutes a 'reasonable investigation' will vary depending on the circumstances of the case." *Marchisio*, 919 F.3d at 1302 (quoting *Felts*, 893 F.3d at 1312). Furnishers are not strictly liable for reaching an incorrect conclusion as a result of their investigation. *See Milgram v. Chase Bank USA, N.A.*, 72 F.4th 1212, 1218 (11th Cir. 2023). Rather, "[w]hen a furnisher reports that disputed information has been verified, the question of whether the furnisher behaved reasonably will turn on whether the furnisher acquired sufficient evidence to support the conclusion that the information was true. This is a factual question, and it will normally be reserved for trial." *Hinkle v. Midland Credit Mgmt., Inc.*, 827 F.3d 1295 (11th Cir. 2016) (citing *Westra v. Credit Control of Pinellas*, 409 F.3d 825, 827 (7th Cir. 2005)). "When a furnisher has access to dispute-related information beyond the information provided by the CRA, it will often be reasonable for the furnisher to review the additional information and conduct its investigation accordingly." *Hinkle*, 827 F.3d at 1306.

### 1. A reasonable jury could conclude that Regions's investigation was unreasonable.

Regions claims that it has robust investigative procedures and that its dispute specialists followed these procedures when investigating Barwick's dispute. (Doc. 31 ¶¶ 15–34.) Indeed, Regions describes a process where dispute specialists are trained in a variety of software systems and relevant law (Doc. 31 ¶ 16), and then are required to review the ACDV forms and relevant documents within Regions's

systems, all while corroborating their processes with an internal ACDV checklist (Doc. 31 ¶¶ 18–19). Yet, despite these alleged "robust" procedures, two Regions dispute specialists concluded it was "accurate" to report that a loan closed in 2017 had missed payments from dates in 2020 and 2021. (Doc. 31 ¶¶ 29, 34.).

Despite these illogical, and downright impossible, conclusions, Regions stresses that the Court must assess the *process* of the investigation rather than the *outcome*. (Doc. 31 at 16–17; Doc. 41 at 6.) To that extent, the Court agrees, as "consumers cannot sue directly for the outcome of an investigation." *Milgram*, 72 F.4th at 1218. But Regions has not explained how its dispute specialists could have "acquired sufficient evidence to support the conclusion that the [Late Payment] information was true" through the process of these investigations. *Hinkle*, 827 F.3d at 1303.

Barwick offers a potential answer: maybe the dispute specialists did not actually follow Regions's policies, requiring review of the loan's specific payment history information, and simply checked the boxes on the ACDV checklist. (Doc. 38 at 15–17.) Or maybe Region's procedures are simply not reasonable, as evidenced by the absurd result that occurred here. Perhaps, as in *Marchisio*, where a furnisher continued to report consumers' mortgage payments as delinquent more than four years after a settlement agreement discharging the debts and after the consumer had filed a lawsuit, Regions's system is fundamentally flawed. *See Marchisio*, 919 F.3d

11

at 1302 ("Aware that whatever system it had to accomplish this was unreliable and aware that incorrect information concerning Plaintiffs' loan balance was still being reported, it was incumbent on Defendant to take steps to ensure that news of the terms of the settlement agreement be communicated to those who generate reports to reporting agencies. Given Defendant's decision not to take those steps, it was quite foreseeable that any investigation of the disputed information here would yield an incorrect conclusion by the employee-investigator.").

Regardless, determining whether Regions's procedures were facially reasonable and further whether the Regions dispute specialists actually followed these procedures falls within the province of the jury. Accordingly, the Court does not grant Regions's Motion for Summary Judgment on this ground.

### 2. A reasonable jury could conclude that Region's behavior constituted a willful violation of the FCRA.

Barwick further claims that Regions actions constitute a willful violation of the FCRA. "Under 15 U.S.C. § 1681n(a), 'any person who willfully fails to comply with any requirement imposed under this subchapter with respect to any consumer is liable to that consumer' for actual, statutory, or punitive damages." *Collins v. Experian Info. Sols., Inc.*, 775 F.3d 1330, 1336 (11th Cir.) (quoting 15 U.S.C. § 1681n(a)), *on reh'g sub nom. Collins v. Equable Ascent Fin., LLC*, 781 F.3d 1270 (11th Cir. 2015). "The Supreme Court has held that 'reckless disregard of a requirement of FCRA would qualify as a willful violation within the meaning of §

1681n(a).'" *Collins*, 775 F.3d at 1336 (quoting *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 71 (2007)); *see also Harris v. Mexican Specialty Foods, Inc.*, 564 F.3d 1301, 1310 (11th Cir. 2009) ("A violation is 'willful' for the purposes of the FCRA if the defendant violates the terms of the Act with knowledge or reckless disregard for the law." (citing *Safeco*, 551 U.S. at 60)). Recklessness means "conduct violating an objective standard: action entailing 'an unjustifiably high risk of harm that is either known or so obvious that it should be known.'" *Safeco*, 551 U.S. at 68 (quoting *Farmer v. Brennan*, 511 U.S. 825, 836 (1994)). The furnisher must "r[un] a risk of violating the law substantially greater than the risk associated with a reading that was merely careless." *Safeco*, 551 U.S. at 69.

Based on these facts, where there is a genuine dispute over whether Regions's dispute specialists actually followed Region's procedures in investigating Barwick's disputes and there is a genuine dispute over whether Regions's system itself is fundamentally flawed, a reasonable jury could find that Regions willfully violated the FCRA. *See Pinson v. JPMorgan Chase Bank, Nat'l Assoc.*, 942 F.3d 1200, 1212 (11th Cir. 2019) (finding a consumer had sufficiently alleged the furnisher willfully violate the FCRA when the consumer alleged the furnisher failed to investigate his three separate disputes); *Hinkle*, 827 F.3d at 1307 ("[A] reasonable jury could find that [the furnisher] either knowingly or recklessly reported debts as 'verified' without obtaining sufficient documentation to support that determination. . . . A

13

reasonable jury could find that [the furnisher] adopted such a system with reckless disregard for the fact that it would result in perfunctory review in contravention of the FCRA."); *see also Marchisio*, 191 F.3d at 1303 ("Also obvious is that this is not a case . . . where courts [have] found no willful violation based on a single human error that was promptly corrected.").

### 3. Barwick has sufficiently shown damages to survive summary judgment.

"[F]ailure to produce evidence of damage resulting from a FCRA violation mandates summary judgment." *Nagle v. Experian Info. Sols., Inc.*, 297 F.3d 1305, 1307 (11th Cir. 2002) (citing *Cahlin v. Gen. Motors Acceptance Corp.*, 936 F.2d 1151, 1156 (11th Cir. 1991), *superseded by statute on other grounds as recognized in Santos v. Healthcare Revenue Recovery Grp., LLC*, 90 F.4th 1144, 1156 (11th Cir. 2024)). Barwick concedes that he did not suffer damage to his credit as a result of any FCRA violation in this case. (Doc. 38 at 22.) But Barwick argues for damages relating to his emotional distress, as well as statutory damages provided by 15 U.S.C. § 1681n for willful FCRA violations. (*Id.*)

As explained in the preceding section, Barwick has sufficiently shown a willful violation of the FCRA at this stage, which could entitle him to statutory damages and punitive damages. 15 U.S.C. § 1681n; *see Santos v. Healthcare Revenue Recovery Grp., LLC*, 90 F.4th 1144, 1152 (11th Cir. 2024).

In terms of damages related to Barwick's emotional distress, the Court further finds there is a genuine issue of material fact. In *Marchisio*, the Eleventh Circuit reversed the district court's grant of summary judgment to the defendant on the consumer's emotional distress damages claim, explaining that "there must be a causal connection between the [FCRA] violation and the emotional harm" and that plaintiff's emotional distress being "exacerbated" by the statutory violation raised a genuine issue of the causal connection. *Marchisio*, 919 F.3d at 1304 (finding the consumer's testimony of feeling "'flushed and shaky, nervous, [and] tense' . . . . having arguments with his wife and experiencing anxiety and rapid heartbeats . . . raise[d] genuine issues of material fact concerning emotional distress"); *see also Thompson v. San Antonio Retail Merchants Ass'n*, 682 F.2d 509, 513 (5th Cir. 1982) (explaining that under the FCRA, "[h]umiliation and mental distress do constitute recoverable elements of damages").

While Regions contends that Barwick cannot be entitled to emotional distress damages unless he also proves economic damages, the Eleventh Circuit has never established this as a requirement. *See Levine v. World Fin. Network Nat. Bank*, 437 F.3d 1118, 1124 (11th Cir. 2006) (stating, in dicta, "[s]everal courts have previously recognized the possibility that a claim for actual or compensatory damages under FCRA may include compensation for emotional distress in the absence of physical injury or out-of-pocket expenses"). Rather, so long as a consumer demonstrates

15

emotional distress, it seems such damages are available. *See Marchisio*, 919 F.3d at 1304.

Barwick's testimony creates a genuine issue of material fact over whether Regions caused his emotional distress. *See Otwell v. Home Point Fin. Corp.*, No. 4:19-CV-01120-ACA, 2021 WL 2587964 at *3 (N.D. Ala. Apr. 23, 2021) (finding that under Eleventh Circuit precedent, a plaintiff's own testimony of emotional distress damages can be sufficient to survive summary judgment); *Ball v. Navient Sols., LLC*, No. 1:16-CV-853-WKW-DAB, 2018 WL 1413393 at *4 (M.D. Ala. Jan. 19, 2018) (denying summary judgment to the CRA because the consumer's testimony of anxiety manifesting in headaches, lack of sleep, anger, and frustration created a "viable claim"). In his deposition, Barwick testified the entire situation with Equifax and Regions—from initially finding out about the inaccurate information through the dispute process—increased his anxiety and depression and ultimately "hurt[] [his] marriage" and "hurt[] [his] relationship with [his] children." (Doc. 34-2 at 295:7–297:21.) When he received Equifax's response to his first dispute showing that regions incorrectly verified the loan payment history, Barwick testified to his anxiety increasing "dramatically." (*Id.* at 295:12–16, 299:18–23.) Those symptoms "exponentially increased" after he received Equifax's response to the second dispute. (*Id.* at 301:10–24.) Barwick testified to his muscles tensing up

in his back and neck when his anxiety increased, which ultimately caused tension headaches he "c[ouldn't] get rid of." (*Id.* at 303:4–11.)

In its motion for summary judgment, Regions points to portions of Barwick's testimony showing that Barwick has struggled with anxiety for over twenty years, and Regions further argues that Barwick has other sources of anxiety that are unrelate to Regions. (Doc. 31 at 25–27.) But the fact that Barwick generally struggles with anxiety and has other sources of anxiety does not contradict Barwick's testimony that Region's conduct *also* caused emotional distress. It is up to a jury to decide the credibility of Barwick's claims of injury. Barwick's testimony of his own emotional distress following the interactions with Regions are sufficient to survive summary judgment.

## B. Equifax's Liability

Under the FCRA, CRAs must use "reasonable procedures to assure maximum possible accuracy" when preparing a credit report, 15 U.S.C. § 1681e(b), and conduct "reasonable reinvestigation[s] to determine whether disputed information is inaccurate" when a consumer disputes their credit file. 15 U.S.C. § 1681i(a). The FCRA allows a consumer to recover damages when a CRA violates either provision negligently, 15 U.S.C. § 1681o, or willfully, 15 U.S.C. § 1681n.

Barwick alleges Equifax violated § 1681e(b) and § 1681i both negligently and willfully.[4]

### 1. Liability under § 1681e(b)

To establish a violation of § 1681e(b), a consumer must show "the agency's report contained factually inaccurate information, that the procedures it took in preparing and distributing the report weren't 'reasonable,' and that damages followed as a result." *Losch v. Nationstar Mortg. LLC*, 995 F.3d 937, 944 (11th Cir. 2021). First, the consumer must establish a "report" was published to a third party. *Collins*, 775 F.3d at 1335 ("[A] 'consumer report' requires communication to a third party, while a file does not."). Then, the consumer must show the published report failed the "maximum accuracy possible" standard. *Erickson v. First Advantage Background Servs. Corp.*, 981 F.3d 1246, 1252 (11th Cir. 2020). This standard requires the "information must be factually true and also unlikely to lead to a misunderstanding." *Id.* If the credit report failed this standard, the consumer must

---

[4] In the Complaint, Plaintiff also alleged Equifax failed to notify Regions of the dispute within five days and failed to provide all relevant information provided by the Plaintiff to Regions, thus violating 15 U.S.C. § 1681i(a)(2). (Doc. 1-1 ¶ 39.) While neither party discusses this allegation in this Motion, the undisputed facts demonstrate there is no factual ground for the allegation. Equifax notified Regions of Plaintiff's first dispute within five days — receiving the letter on July 11, 2022 (Doc. 34-1 ¶ 56) and notifying Regions on July 13, 2022 (Doc. 33 ¶ 48). Equifax sent "all relevant information" received from Plaintiff, i.e. the Plaintiff's dispute letter, to Regions with the notice of the first dispute. (*Id.*) Equifax notified Regions of Plaintiff's second dispute within five days – – receiving the letter on September 6, 2022 (*Id.* ¶ 51) and notifying Regions on September 7, 2022 (*Id.* ¶ 56). Equifax sent "all relevant information" provided by Plaintiff, i.e. Plaintiff's second dispute letter and the attached September 2017 letter, to Regions with the notice of the second dispute. (*Id.* ¶ 57.) Based on these undisputed facts, any claims against Equifax under 15 U.S.C. § 1681i(a)(2) are hereby considered DISMISSED.

show it was the result of "unreasonable procedures." *See Losch*, 995 F.3d at 945 (finding the reasonableness of a CRA's procedure hinges on the CRA's notice of potential inaccuracy). Finally, the consumer must show the inaccurate credit report injured the consumer. *Id.* at 944.

The parties dispute whether Equifax published a credit report to third parties, whether Equifax's procedures were unreasonable, and whether Barwick has sufficiently shown damages. The Court finds summary judgment is due to be GRANTED because Equifax's procedures were reasonable as a matter of law.[5]

### i.     Equifax's procedures were reasonable as a matter of law.

A CRA is not liable under § 1681e(b) if a report, even a factually inaccurate report, was the product of "reasonable procedures." 15 U.S.C. § 1681e(b). Whether procedures were reasonable "will be a jury question in the overwhelming majority of cases." *Cahlin v. Gen. Motors Acceptance Corp.*, 936 F.2d 1151, 1156 (11th Cir. 1991), *superseded by statute on other grounds as recognized in Santos v. Healthcare Revenue Recovery Grp., LLC*, 90 F.4th 1144, 1156 (11th Cir. 2024). In *Losch*, the

---

[5] Because it is not necessary for this holding, the Court does not explicitly discuss whether Equifax published an inaccurate report to third parties, which Barwick would have to show for Equifax to be liable under § 1681e(b). However, the Court notes that in *Losch*, the Eleventh Circuit "dr[ew] all inferences in [the consumer's] favor" and found inquiries into a consumer's credit were "sufficient to show that the report was sent to third parties" for purposes of summary judgment. *Losch*, 995 F.3d at 943. Similarly, here, Barwick has not produced a specific credit report published to a third party containing the Late Payments. But Barwick points to evidence in the record that third parties inquired into his credit while his credit file contained the Late Payments. (Doc. 34-1 at 249, marked EIS-BARWICK-001926.) Following the example of *Losch*, this Court suggests a similar inference could be drawn in Barwick's favor that evidence of inquiries into his credit are sufficient at summary judgment to find a credit report was published to a third party.

Eleventh Circuit noted it had not "had much occasion to address the meaning of the term 'reasonable' under either §1681e or §1681i, so [it] rel[ied] on other courts' guidance." *Losch*, 995 F.3d at 945. The Eleventh Circuit proceeded to find a "reporting agency's procedures will not be deemed unreasonable unless the agency has reason to believe the information supplied to it by a data furnisher is unreliable." *Losch*, 995 F.3d at 945 (citing *Sarver v. Experian Info. Sols.*, 390 F.3d 969, 972 (7th Cir. 2004)). That is "[b]ecause 'lenders report many millions of accounts to [CRAs] daily'" and so "requiring [CRAs] to examine each report individually for errors would be unduly costly." *Losch*, 995 F.3d at 945 (quoting *Sarver*, 390 F.3d at 972).

The Eleventh Circuit has not established the parameters of sufficient "notice" for §1681e(b) liability. *See Losch*, 995 F.3d at 945 n.6 (granting summary judgment to the CRA "to the extent that any of Losch's claims under § 1681e allege that Experian acted unreasonably in preparing any credit reports before he informed it of the relevant inaccuracy"); *Benjamin*, 561 F. Supp. 3d at 1339 ("Losch's minimal discussion of the §1681e(b) claims does not provide meaningful guidance concerning the degree of notice necessary to establish liability under §1681e(b)."). However, the Tenth Circuit suggested a CRA is on "notice" of a potential inaccuracy when the information "is inconsistent with the CRA's own records[,]" "comes from an unreliable source[,]" or "contains factual inaccuracy." *Wright v. Experian Info. Sols., Inc.*, 805 F.3d 1232, 1239 (10th Cir. 2015); *see, e.g.*, *Cortez v. Trans Union,*

*LLC*, 617 F.3d 688, 710 (3d Cir. 2010) (affirming jury verdict for the consumer when the furnished information was inconsistent with the CRA's own record of the consumer's middle name, last name, date of birth, and citizenship); *Ohai v. Delta Cmty. Credit Union*, No. 1:20-CV-02220-SCJ, 2023 WL 8351624 at *9 (N.D. Ga. Sept. 7, 2023) (denying summary judgment for the CRA because "there [was] a question of fact as to whether the report was generated following reasonable procedures" when the furnisher's credentialing application was blank under the "FCRA training" and certification fields); *Sarver*, 390 F.3d at 972 (affirming summary judgment for the CRA because there was no evidence of systemic inaccuracies when the plaintiff only alleged the CRA should have noticed an anomaly in the specific consumer's information).

Here, Barwick does not allege that, like in *Cortez*, inconsistent personal information put Equifax on notice of the Late Payments' inaccuracy. Additionally, Barwick does not claim Equifax was on notice due to Regions being an unreliable source like the court in *Ohai* found. Rather, Barwick argues the Late Payment information was so anomalous that Equifax was on notice of its inaccuracy.

Barwick's argument is similar to the consumer's argument in *Sarver*, a Seventh Circuit case the Eleventh Circuit relied on in *Losch*. There, the CRA erroneously reported one of the consumer's bank accounts as "being involved in bankruptcy." *Sarver*, 390 F.3d at 970. The consumer argued the CRA "should have

21

noticed" other concurrent, problematic bank accounts were not listed as involved in bankruptcy. *Id*. at 972. In reviewing summary judgment, the court characterized the consumer as asking, "each computer-generated report be examined for anomalous information and, if it is found, an investigation be launched." *Id*. Concerned with the burden this would place on CRAs, the court disagreed, writing that "[i]n the absence of notice of *prevalent* unreliable information from a reporting lender . . . we cannot find that such a requirement to investigate would be reasonable." *Id*. (emphasis added).

Like the *Sarver* consumer, Barwick argues the Late Payment information was so anomalous—delinquent payments due and made on a mortgage after the mortgage was fully paid and closed—Equifax should have realized it was inaccurate. But like the *Sarver* consumer, Barwick fails to demonstrate systemic or "prevalent" anomalies and instead only points to *one* anomalous piece of information. Because of this, as in *Sarver*, the anomalous Late Payment information did not put Equifax on notice of the information's inaccuracy. Under the *Losch* standard, because Equifax was not on notice of the inaccuracy, its procedures were reasonable.

Accordingly, summary judgment on Barwick's § 1681e(b) claim against Equifax is due to be GRANTED.

### 2.  Liability under § 1681i

When a consumer disputes "the completeness or accuracy of any item of information" in their "file at a consumer report agency," the CRA is required to conduct a "reasonable reinvestigation to determine whether the disputed information is inaccurate." 15 U.S.C. § 1681i(a)(1)(A). While § 1681i is triggered by a different scenario than § 1681e—the consumer disputing the information in their credit file––"the elements of a claim under § 1681i . . . are the same, except that the plaintiff needn't show that the agency prepared and distributed a report." *Losch*, 995 F.3d at 944 (citing *Collins*, 775 F.3d at 1335). Namely, to establish a violation of § 1681i, a consumer must show their credit file contained a factual inaccuracy, that the CRA failed to conduct a reasonable reinvestigation, and that damages followed. *See Losch*, 995 F.3d at 944.

Here, the parties do not explicitly agree that Equifax's credit file on Barwick contained factual inaccuracies.[6] However, upon review of the record, the court finds this fact to be indisputable.[7] Based on this, the only disputed issues are whether

---

[6] Rather than admit the Late Payment information was inaccurate, Equifax states, "at the time of Plaintiff's disputes regarding the 2020 and 2021 late payments . . . Equifax did not know Plaintiff paid his mortgage in full in 2017." (Doc. 39 at 4:16.) When asked if it was factually inconsistent for late payments to be due on a closed mortgage, an Equifax representative stated, "I would not say that Equifax will agree that it is inconsistent." (Doc. 35-92 at 48:19–49:7.)

[7] Barwick fully paid and closed the mortgage at issue in August 2017. (Doc. 31 ¶¶ 1, 3; Doc. 37-1 ¶¶ 5, 8; Doc. 35-92 at 45:15–17.) Because of this, the Late Payments—that late payments were due and were made on the mortgage after August 2017—were objectively false. Further, the record contains Equifax's credit file for Barwick as of September 2022 and it did include the Late Payments. (Doc. 34-1 at 197.)

Equifax conducted a reasonable reinvestigation and, if it did, whether Barwick has shown sufficient damages. Finding genuine issue as to the reasonableness of Equifax's reinvestigation and Barwick's injuries, summary judgment is due to be DENIED.

### i. There is a genuine issue as to whether Equifax's reinvestigation was reasonable.

Like reasonableness under §1681e(b), the reasonableness of a CRA's investigation under §1681i is often a question of fact for a jury to determine. *Losch*, 995 F.3d at 944 (citing *Cahlin*, 936 F.2d at 1156). When determining the legal boundaries of a "reasonable reinvestigation," the Eleventh Circuit was once again strongly persuaded by other circuits' decisions. *See Losch*, 995 F.3d at 945. The reasonable reinvestigation required by § 1681i is a higher standard than the reasonable procedure required by § 1681e(b). *See id.* This is because, "once a claimed inaccuracy has been pinpointed, a consumer reporting agency conducting further investigation incurs only the cost of reinvestigating that one piece of disputed information." *Losch*, 995 F.3d at 945 (quoting *Cushman v. Trans Union Corp.*, 115 F.3d 220, 225 (3d Cir. 1997)). "Although the parameters of a reasonable investigation will often depend on the circumstances of a particular dispute, it is clear that a reasonable reinvestigation must mean more than . . . making only a cursory investigation into the reliability of information that is reported to potential

creditors." *Cortez v. Trans Union LLC*, 617 F.3d 688, 713 (3d Cir. 2010) (citing *Cushman*, 115 F.3d at 225).

For example, there is a genuine dispute of the reasonableness of a CRA's reinvestigation when a consumer provides a detailed dispute and the CRA could have conducted an independent investigation, but instead the CRA solely relies on the furnisher's ACDV response. *See Losch*, 995 F.3d at 947. In *Losch*, the CRA's file stated a consumer had a past-due balance of $10,000 on a mortgage loan that had been disposed of in bankruptcy. *Id.* at 941. Upon realizing the inaccuracy, the consumer mailed the CRA a letter including the account number of the disputed mortgage and explaining the effect of the bankruptcy proceeding. *Id.* As reinvestigation, the CRA sent the furnisher an ACDV. *Id.* When the furnisher verified the information, the CRA "relayed the same information" to the consumer and "took no further steps to verify the debt." *Id.* The court found that because the CRA had sufficient information to conduct an independent investigation—checking the bankruptcy docket—but instead blindly relied on the furnisher's response to the ACDV, "a jury could find [the CRA] was negligent in discharging its obligations to conduct a reasonable investigation." *Id.* at 946–47; *see also Collins*, 775 F.3d at 1333 (affirming the genuine issue of the reasonableness of the CRA's reinvestigation "when it disregarded the small claims court information [the consumer] provided and instead relied solely on [the furnisher] to verify the debt").

The Eleventh Circuit's decisions on the reasonableness of a CRA's reinvestigation under §1681i have only involved cases where there was an extrinsic source of information the CRA could have referred to, like the public bankruptcy docket in *Losch*. However, the Seventh Circuit recently considered the reasonableness of a CRA's reinvestigation when there was *not* an extrinsic source of information. *See Chaitoff v. Experian Info. Sols., Inc.*, 79 F.4th 800, 818 (7th Cir. 2023).

An investigation may not be reasonable when the CRA did not attempt to explain a mismatch between information the consumer provided and the furnisher's ACDV response. *See id.* In *Chaitoff*, the consumer entered a special payment plan with the mortgage servicer to bring his delinquent mortgage current. *Id.* at 809–10. The mortgage loan was modified according to the plan after the consumer complied with the requirements. *Id.* But the CRA reported the mortgage as delinquent without mentioning the special payment plan. *Id.* To dispute the credit report, the consumer sent the CRA a dispute letter and attached correspondence from the mortgage servicer partially detailing the special payment plan and confirming the consumer complied with the terms. *Id.* As a reinvestigation, the CRA sent an ACDV to the mortgage servicer. *Id.* When the mortgage servicer confirmed the current credit reporting, the CRA "stood by its original reporting." *Id.* Then, as a second dispute, the consumer sent a "substantially similar dispute letter" to the CRA, which

proceeded to take the same steps to reinvestigate the disputed information. *Id*. The circuit court reversed summary judgment for the CRA finding a "reasonable jury could conclude that [the CRA] should have taken additional steps to investigate the mismatch between" the ACDV response and letter the consumer provided. *Id*. at 818. For example, the court suggested the CRA could have asked the mortgage servicer to explain the mismatch. *Id.* Further, the court found "a jury could find that repeating the same ineffective steps was not a reasonable response to [the consumer's] second letter." *Id.* at 819.

Here, according to Equifax, after it received Region's ACDV response, it "completed the remainder of its reinvestigation, reviewed and considered all relevant information, including the ACDV response, and applied its policies and procedures" to determine the Late Payment information was accurate. (*Id.* ¶ 81.) However, Equifax admitted that it did not go "beyond" Regions's ACDV response to determine the accuracy of the Late Payment information. (Doc. 35-92 at 113:25–114:12.) Specifically, the following testimony was provided by Equifax legal support lead, Shetonjela Barber:

> Q. [by attorney] Other than contacting Regions and asking Regions to verify information, Equifax didn't perform any investigation of the information Mr. Barwick disputed in his August 29, 2022 dispute letter, did it?
> A. Read that to me again?
> Q. Other than contacting Regions with the ACDV –
> A. Yes.

Q. – that was the extent of Equifax's investigation of that dispute?

A. That's correct.

Q. And the results were simply what Regions told it in response to that?

A. That is correct.

Q. Okay. Equifax didn't do anything beyond what I just said in investigating, did it?

A. No, it did not.

Q. No independent separate investigation?

A. No.

(*Id.*)

The crux of Barwick's allegation is that, like the CRAs in *Losch* and *Collins*, Equifax did not conduct an independent investigation of the Late Payment information in his credit file. However, unlike the situations in *Losch* and *Collins*, only Regions—not a publicly available court docket like in *Losch* and *Collins*—had information on whether Barwick fully paid and closed his mortgage. Because of this, it is unclear if Equifax *could* find accurate information through an independent investigation like *Losch* calls for.

However, this case is analogous to *Chaitoff*. Like the documentation included in the *Chaitoff* dispute, which suggested the existence of the special payment plan, the September 2017 letter from Regions suggested Barwick's mortgage was paid in full and closed in August 2017. Like the ACDV response in *Chaitoff*, which verified the absence of a special payment plan from the consumer's credit report, Regions's ACDV response verified payments being due on the mortgage after August 2017. And so, like *Chaitoff* where the ACDV response did not match the documentation

in the CRA's possession, Regions's ACDV response did not match the September 2017 letter. As in *Chaitoff*, there is no record of Equifax's reinvestigation going beyond Regions's ACDV response, such as asking Regions to explain the specific mismatch. Because of this failure to conduct an independent investigation in the face of mismatching information, there is a genuine issue of the reasonableness of Equifax's investigation.

### ii. Barwick has sufficiently shown damages to survive summary judgment.

Finally, to establish a violation of § 1681i, Barwick must show Equifax's unreasonable reinvestigation caused him damages. *Losch*, 995 F.3d at 944. As explained above, the Eleventh Circuit has indicated that emotional distress damages are available for violations of the Fair Credit Reporting Act. *See Marchisio*, 919 F.3d at 1304; *Levine*, 437 F.3d at 1124. And Barwick's testimony, explaining that his anxiety and depression have increased as a result of Equifax's unreasonable investigations, sufficiently establishes, at this stage, that Equifax caused Barwick damages. (Doc. 34-2 at 295:7–297:21, 299:18–23, 301:10–24, 303:4–11.) Therefore, summary judgment on Barwick's § 1681i claim against Equifax is due to be DENIED.

### 3. Willful violation

While Barwick's § 1681i claim survives summary judgment, his allegations that Equifax violated the statute willfully, under § 1681n, do not survive summary

judgment. As previously explained, "[t]o establish a willful violation" of the FCRA, Barwick must show that Equifax "either knowingly or recklessly" violated the statute. *Losch*, 995 F.3d at 947 (quoting *Pedro v. Equifax, Inc.*, 868 F.3d 1275, 1280 (11th Cir. 2017)).

In *Losch* and *Collins*, where the CRAs' investigations only consisted of sending an ACDV to the furnisher, the Eleventh Circuit found the consumers' allegations of willful § 1681i violation did not survive summary judgment. *See Losch*, 995 F.3d at 947; *Collins*, 775 F.3d at 1335. Similarly, here, Equifax investigated Barwick's disputes by sending an ACDV to Regions. In step with *Losch* and *Collins*, summary judgment on Barwick's allegation of willful violation of § 1681i is due to be GRANTED.

## IV.   Conclusion

For the reasons discussed above, Defendant Regions's Motion for Summary Judgment is due to be denied. (Doc. 31.) Defendant Equifax's Motion for Summary Judgment is due to be granted in part and denied in part. (Doc. 33.) The Court will enter an Order consistent with this Memorandum of Opinion.

**DONE** and **ORDERED** on April 12, 2024.

L. Scott Coogler
United States District Judge

215755

30